

Signed/Docketed
June 30, 2011

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-32943 MER |
| RANCHER ENERGY CORPORATION, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## ORDER

This matter comes before the Court on the *Debtor's First Omnibus Objection to Stock Holder Proofs of Claim Nos. 38 through 49* (the "Objection"), and the Claimants' response thereto (the "Response"). The Court held an evidentiary hearing, and permitted the parties to file written closing statements. Based on its consideration of the evidence and legal arguments presented by the parties, the Court makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. §157(b)(2)(B), as it concerns the allowance or disallowance of claims against the estate.

## BACKGROUND

The Debtor, Rancher Energy Corporation ("Rancher") objects to the claims filed by the following claimants: Frank W. Cutler, FWC Educational Trust, Walfran Ltd., Dewain Campbell/Dewain E. Campbell Recoverable Trust, James Deccio, Ralph F. Karp, Erin Rahn, Eva Ferencova, Merrill McCarthy, B.M., a minor and L.M., a minor (the "Claimants").[1] The Proofs of Claim state they are based on "securities violations" related to purchases of stock in Rancher that occurred in December 2006 and January 2007.[2] Rancher's Objection denies making any

---

[1] The Claimants filed their proofs of claim (Nos. 38-49) on March 3, 2010 (the "Proofs of Claim"). Objection, ¶ 1. However, the Court notes Claim No. 46 was filed by one Edward J. Names, and does not appear related to the Objection. Accordingly, any findings herein do not pertain to Claim No. 46.

[2] Specifically, Item 7 attached to Claim Nos. 38, 39, 40, 41, 42, 43, 44, 45, 47, 48, and 49 states:

Debtor accepted funds from Claimant in exchange for the issuance of stock warrants and stock of the debtor corporation, all in violation of applicable laws, including but not limited to the Securities Act of 1933 ("the Act") as amended, and Regulation D promulgated by the SEC under the Act relating to the issuing corporation's qualification for exemption from the otherwise mandated registration of stock with the SEC.

false statements to any Claimant, omitting any information required to be provided, or failing to provide complete and accurate reports to the Securities and Exchange Commission.  Rancher also denies any reliance by the Claimants, and denies Rancher failed to make appropriate investigations as to whether the Claimants were accredited investors.  According to Rancher, the subject claims are barred by the statute of limitations, and, to the extent they could be allowed, the claims are subordinated to the level of common stock pursuant to 11 U.S.C. § 510(b).[3] Further, Rancher alleges the claims are vague, contain no factual statements demonstrating a basis for a claim, and should be revised to provide a more definite statement under FED. R. CIV. P. 12(e).[4]

The Response alleges the Claimants are not stockholders but unsecured creditors, basing their claims on Rancher's failure to disclose information and other violations of applicable securities laws.  The Claimants contend these alleged actions (or omissions), entitle the Claimants to a ruling that the sale of stock to them was void *ab initio*, and that Rancher should be liable for the approximately $1.9 million paid for the securities as an unsecured debt.  Their major arguments are as follows:

•       Rancher was not exempt from registration under Regulation D and accompanying Rules 501-506, because Rancher did not ensure all investors were accredited -- *i.e.*, of sufficient means and business knowledge.  If Rancher had performed the investigation necessary to determine whether the Claimants were accredited investors, Rancher would have discovered Frank Cutler was an accredited investor, but the other Claimants were not.

---

By virtue of such violations and irregularities, the stock sale transaction between Claimant and the Debtor was rendered illegal, void, and rescindable. Claimant's counsel has spoken to and corresponded with Debtor and Debtor's counsel demanding rescission of the transaction and disgorgement of all Claimant's funds, and specifying with particularly [sic] each and every securities violation by the Debtor. Such violations included, but are not limited to, Debtor's manifest failure to investigate and determine (prior to sale) Claimant's putative status as an accredited investor, Debtor's failure to disclose (prior to sale) to Claimant the rights and duties of Debtor and the Claimant under the Act, Debtor's failure (prior to sale) to provide other legally required items of financial and non-information [sic] and documentation to the Claimant, and Debtor's failure, both before and after the purported stock sale, to provide complete and accurate reports to the SEC as required by law. However, Debtor failed and refused, and continues to fail and refuse, without justification or legal excuse, to comply with such demand. Because the subject purported stock sale was void, illegal, and rescindable and was actually rescinded, the Claimant is not now, nor ever has been, the legal or equitable holder of any stock warrants or stock, or any equity or ownership right, title or interest in the Debtor corporation as shareholder or otherwise.  Claimant has instead enjoyed at all times the status as an unsecured creditor and the herein Proof of Claim for money is presented and predicated upon the invalidity of the stock tale and Claimant's consequent status as an unsecured creditor.

[3]  Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[4]  The statute of limitations and vagueness arguments initially raised by Rancher were not developed at trial, and the Court has not used them as a basis for this ruling.

- Rancher did not provide the financial and non-financial information, prior to sale of stock, required under Regulation D, Rules 505-506.

- Under the California Corporation Code, asserted by the Claimants to be applicable because the Claimants reside in California, Rancher had to determine, prior to sale, that non-accredited investors had a prior relationship to Rancher. This Rancher failed to do.

In their post-trial briefs, the parties discussed whether the failure of Rancher to issue common stock (but rather promissory notes convertible to common stock), in return for the Claimants' transfer of funds to Rancher, placed the transaction outside the scope of § 510. The Claimants contend since the common stock was not transmitted to them until approximately two years following their payment, the contract for the purchase of securities was void for a lack of meeting of the minds. Further, the Claimants argue since they received promissory notes, they should be treated as other holders of notes would be in a bankruptcy proceeding, that is, as unsecured creditors.

Rancher, on the other hand, asserts the Claimants were informed the subject stock offering was oversubscribed, and the Claimants would receive convertible notes until a shareholder vote could be held. According to Rancher, the Claimants' later acceptance of shares of common stock completed the transaction, and thus, any subsequent claims fall within § 510(b)'s definition of a claim for rescission.

## DISCUSSION

Pursuant to § 501(a), a creditor may file a proof of claim, and a properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim.[5] Absent an objection, a proof of claim is deemed allowed.[6] When an objection is filed, the objecting party has the burden of presenting evidence supporting the objection, which must be of probative value equal to that of the allegations in the proof of claim.[7] However, the creditor bears the ultimate burden of persuasion as to the validity and amount of the claim.[8]

Here, the parties agreed, both at the hearing on the adequacy of Rancher's Disclosure Statement held February 16, 2011, and at the hearing held on the Objection on March 18, 2011, the pertinent issue before the Court at this time is whether the Claimants' claims are subject to subordination pursuant to § 510(b). Rancher's proposed plan of reorganization addresses the

---

[5] FED. R. BANKR. P. 3001(f); *In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993).

[6] 11 U.S.C § 502(a); *Harrison*, 987 F.2d at 680 (citing *In re Padget*, 119 B.R. 793, 797 (Bankr. D. Colo. 1990)).

[7] *In re Geneva Steel Co.*, 260 B.R. 517, 524 (10th Cir. BAP 2001) (citing *Abboud v. Abboud (In re Abboud)*, 232 B.R. 793, 796 (Bankr. N.D. Okla.), aff'd, 237 B.R. 777 (10th Cir. BAP 1999)).

[8] *Harrison*, 987 F.2d at 680; *Geneva Steel*, 260 B.R. at 524.

treatment of the claims, and provides to the extent the claims exist, they are to be treated as subordinated.  Therefore, the evidence and legal argument presented to the Court dealt only with the subordination issue, which is the issue discussed below.  Additional issues regarding the claims, if any, will be addressed at a later time, if necessary.

**Policy Behind § 510(b)**

Section 510(b) provides:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.[9]

"Joining three separate, dependent clauses, the statute subordinates three types of claims: (1) an actual attempt to rescind a purchase or sale of a security issued by the debtor or one of its affiliates; (2) a claim for damages arising from a purchase or sale of such a security; and (3) a claim for reimbursement or contribution for a purchase or sale of such a security under section 502 of the Code."[10]  "Section 510(b) serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets."[11]

Two recent bankruptcy cases provide useful discussions of the policy and operation of § 510(b).  The United States Bankruptcy Court for the Southern District of Florida explained:

Part of the theoretical underpinning on which Congress based the policy decision enacted in section 510(b) were the writings of law professors John Slain and Homer Kripke. See Slain, John and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy-Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U.L.Rev. 261 (1973).  The essential elements of Slain's and Kripke's argument were rooted in the concepts of risk allocation to investors and creditors.  *See In re PT-1 Communs., Inc.*, 304 B.R. 601, 609 (Bankr. E.D. N.Y. 2004).  The underlying concern was that if an

---

[9]  11 U.S.C. § 510(b).

[10]  *In re Geneva Steel Co.*, 281 F.3d 1173, 1177 (10th Cir. 2002).

[11]  *Racusin v. American Wagering, Inc. (In re American Wagering, Inc.)*, 493 F.3d 1067, 1071 (9th Cir. 2007).

investor who contracted to purchase equity in a corporate debtor were able to rescind that agreement in bankruptcy and to assert a general unsecured claim for rescission damages, that investor would receive a windfall by having had (on the one hand) the upside opportunity to realize the benefits of an equity interest in a profitable entity, and (on the other hand) the ability to rescind the transaction in bankruptcy and to share equally with creditors on a rescission claim.  Slain, 48 N.Y.U.L.Rev. at 286-91. In a report, the United States House of Representatives sheds light on the policy rational behind the enactment of the 510(b) provision in the Bankruptcy Code:

> A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase:  Should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated? . . . Placing rescinding shareholders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors.  The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.

See H. Rep. No. 595, 95th Cong., 1st Sess. (1977) at 194-95, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6154-55.  Hence, courts have described the two policy concerns for mandatory subordination under section 510(b) as: (1) the dissimilar risk and return expectations of shareholders and creditors; and (2) the reliance of creditors on the equity cushion provided by shareholder investment.  *Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 830 (9th Cir. 2001); *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2nd Cir. 2006). . . .

The current case law generally provides a broad interpretation of the "arising from" clause in section 510(b).  This broader reading suggests that the purchase or sale of securities must be part of the chain of events, however, the injury may flow from incidents prior to or subsequent to the ratification of such an agreement.  *See, In re Nal Financial Group, Inc.*, 237 B.R. 225, 231 (Bankr. S.D. Fla. 1999); *In re Enron Corp.*, 341 B.R. 141, 161 (Bankr. S.D. N.Y.2006).  The Third Circuit held in *Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, that a claim for damages arising from a breach by the Debtor on a registration agreement of stock is covered by section 510(b) and must be subordinated. 281 F.3d 133, 137 (3rd Cir. 2002).  The Ninth [sic–appears to mean Third] Circuit stated, "as a textual matter, [we] . . . read 'arising from' as requiring some nexus or causal relationship between the claims and the purchase of the securities," and not limiting this nexus to claims arising out of alleged illegality in the purchase itself.  *Id.*, 281 F.3d at 138.  Similarly,

the Ninth Circuit held that section 510(b) covers breach of contract claims.  *See Nugent*, 240 F.3d at 828-32.[12]

A recent ruling by the Bankruptcy Court for the Southern District of Texas added:

> For purposes of the damages category, the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract.  *See Telegroup*, 281 F.3d at 140, 142. . . . For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale.  *See Telegroup*, 281 F.3d at 138.  Further, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale.  *See id.* at 142; *Geneva Steel*, 281 F.3d at 1179.  "When an investor seeks *pari passu* treatment with the other creditors, he disregards the absolute priority rule, and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law." *Granite Partners*, 208 B.R. at 344.  When a claimant elects to take an equity stake in the debtor, he becomes bound by the choice to trade the relative safety of a fixed return for the "upside potential of shareholder status." *Med Diversified*, 461 F.3d at 256.[13]

### Does the Claimants' Transaction Fall Within Section 510(b)?

Much of the parties' evidence and legal argument in this case concerns whether the agreement by the Claimants to purchase stock lacked a meeting of the minds due to malfeasance by Rancher, rendering it an invalid and void contract.  According to the Claimants, they never entered into a valid contract to purchase stock, and therefore are left with general unsecured debt, as reflected by convertible promissory notes.  Rancher and the Claimants focused their arguments on whether the Claimants' proofs of claim and interactions with Rancher constituted attempts at rescission, as set forth in § 510(b).

For purposes of determining whether the transaction between the Claimants and Rancher here falls within the scope of § 510(b):

> '[R]escission' is not defined in the bankruptcy code.  Black's Law Dictionary defines the term as '[a] party's unilateral unmaking of a contract for a legally sufficient reason, such as the other party's material breach, or a judgment rescinding the contract; voidance.' *Black's Law Dictionary* 1332 (8th ed. 2004).  It defines 'legal rescission' as '[r]escission that is effected by the agreement of the parties.'  *Id.*  The plain language of § 510(b) does not distinguish between equitable rescission by a

---

[12] *In re Patriot Aviation Services, Inc*., 396 B.R. 780, 786-787 (Bankr. S.D. Fla. 2009).

[13] *In re Deep Marine Holdings, Inc.*, 2011 WL 160595, *7 (Bankr. S.D. Tex. January 19, 2011) (slip copy).

court as a remedy for securities fraud and legal rescission by the parties as a remedy for irreconcilable differences.[14]

At first blush, this Court believes the claim is based upon rescission. The proofs of claim filed in this case specifically reference rescission in at least two instances.[15] It seems disingenuous to attempt to recharacterize the claims at this point after a § 510 issue has been raised.

However, even if the claim is not considered to arise from rescission, it still falls within the scope of § 510(b).[16] Specifically, in addition to providing for subordination of claims "arising from rescission of a purchase or sale of a security of the debtor," § 510(b) states claims "for damages arising from the purchase or sale of such a security" shall be subordinated. Courts have recognized § 510(b) can include breach of contract and related claims as well as claims for rescission of securities contracts.[17]

As discussed by the Ninth Circuit Court of Appeals:

Section 510(b) serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets. The principles behind corporate and bankruptcy laws generally do not favor shifting the risk of loss from shareholders to creditors, even if the shareholders are blameless. One of the primary purposes of section 510(b), therefore, is to prevent disappointed shareholders, sometimes the victims of corporate fraud, from recouping their investment in parity with unsecured creditors.

Although many subordination cases sound in fraud, the scope of section 510(b) has been broadened over the years to include claims based on contract law and other actions. The majority of courts in recent years that have confronted the scope of § 510(b), including this one, have concluded that the phrase "arising from" should be read broadly to encompass claims other than fraud claims, such as claims for breach of contract. *See, e.g., In re Telegroup*, 281 F.3d 133, 144 (3rd Cir. 2002) (breach of stock purchase agreement); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001) (breach of merger agreement); *In re Int'l Wireless*

---

[14] *Sea Quest Diving, LP, et al. v. S&J Diving, Inc., et al., (In re Sea Quest Diving, LP)*, 579 F.3d 411, 419 (5th Cir. 2009).

[15] See footnote 2 above.

[16] The Claimants contend their agreement to purchase common stock is void, not rescinded, under California law. *See Village Northridge Homeowners Association v. State Farm Fire and Casualty Company*, 50 Cal 4th 913, 237 P. 3d 598, 602 (Cal. 2010) (quoting *Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal. 4th 394, 415 (Cal. 1996)) (internal quotation marks omitted).

[17] *See, e.g., In re NAL Financial Group, Inc.*, 237 B.R. 225, 233 (Bankr. S.D. Fla.1999); *In re Public Service of New Hampshire,* 129 B.R. 3, 5 (Bankr. D. N.H. 1991).

*Communications Holdings, Inc.*, 257 B.R. 739, 746 (Bankr. D. Del. 2001), aff'd, 279 B.R. 463 (D. Del. 2002), aff'd, 2003 WL 21466898 (3rd Cir. 2003) (breach of stock purchase agreement); *In re PT-1 Communications, Inc.*, 304 B.R. 601, 608 (Bankr. E.D. N.Y. 2004) (tortious interference). That the claim is for breach of contract is not sufficient alone to prevent subordination. As noted above, a number of courts, including this one, have held that breach of contract claims may be subordinated under section 510(b) where there exists "some nexus or causal relationship between the claim and the purchase of the securities. . . ." *Telegroup*, 281 F.3d at 138; *Betacom*, 240 F.3d at 829; *Int'l Wireless*, 257 B.R. at 746; *In re NAL Fin. Group, Inc.*, 237 B.R. 225, 234 (Bankr. S.D. Fla. 1999). These opinions make clear that they were concerned with claims that tried to recharacterize or restate what would otherwise be subordinated securities claims.

As a remedial statute, section 510(b) should be interpreted broadly in order to effectuate the intent of Congress. This principle was recognized in our earlier opinion, *American Broadcasting Sys., Inc. v. Nugent ( In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001), which examined the scope of section 510(b) and is the governing precedent on section 510(b) in the Circuit. In *Betacom*, the claimants held shares in a corporation that entered into a merger agreement with the debtor. The agreement called for the claimants to receive stock of the surviving company in exchange for their shares in the acquired company. The merger agreement never closed and claimants never accepted their tendered shares, which remained in escrow. We held that the claim should be subordinated under section 510(b).

*Betacom* identifies two main reasons for subordination of a claim pursuant to section 510(b): (1) dissimilar risk and return expectations of creditors and shareholders and (2) the reliance of creditors on the equity cushion provided by shareholder investment. *Betacom* focused on the fact that investors expect to take more risks than creditors when they deal with a corporate entity, but we also made clear that a claim should only be subordinated when it will accomplish the purposes of section 510(b).[18]

---

[18] *American Wagering*, 493 F.3d at 1071-73 (The Court went on to find the case before it was dissimilar to the Betacom case because the claimant had not sought to purchase stock, but rather sought recovery on a consulting contract under which his compensation was tied to the value of the debtor's stock after an initial public offering.). *See also In re MarchFirst, Inc.*, 431 B.R. 436, 445 (Bankr. N.D. Ill. 2010) ("[T]he basis of the claim is irrelevant; what matters is the damages sought. A claim to recover the claimant's "equity investment" in the debtor will be subordinated whatever the debtor's actionable conduct.") (citations omitted); *Banco Espirito Santo Int'l, Ltd. v. Garmendia (In re Bankest Capital Corp.)*, 361 B.R. 263, 267 (Bankr. S.D. Fla. 2006) (The language of the statute specifically includes debt securities such as promissory notes.); *In re Patriot Aviation Services, Inc.*, 396 B.R. 780, 787 (Bankr. S.D. Fla. 2008); *Levine v. Resolution Trust Corp. (In re Coronet Capital Co.)*, 1995 WL 429494, *8–9 (S.D. N.Y. July 20, 1995) (finding promissory notes to fall under §510(b), and rejecting the argument § 510(b) should be restricted to equity securities).

In this case, the testimony of Mr. Cutler and the exhibits presented by the Claimants indicate the Claimants intended to, and in fact did, engage in a transaction for the purchase of Rancher's common stock.  Specifically, letters and emails from Mr. Cutler's counsel and Mr. Cutler identify Mr. Cutler and other Claimants as "investors," and discuss the transaction as a stock purchase.  This correspondence sets forth the Claimants' assertions they were not provided with requested information, they were not told about the convertible notes, the offering was defective and violated SEC rules, and disputes existed about whether the investors were accredited.[19]  Despite the Claimants' attempt to characterize their transaction with Rancher as invalid and void, the transaction is nonetheless at its heart a transaction for the purchase of securities of Rancher.  The claims arise from the Claimant's attempts to purchase stock from Rancher.  As with the claimants in *Betacom*, the Claimants "entered into the investment with greater financial expectations than [a] creditor."[20]  Eventually, according to Mr. Cutler's testimony, the Claimants received stock certificates.[21]  There is no evidence the certificates were refused.  Accordingly, whatever the subsequent disputes, the Court finds the claims herein are appropriate for subordination under § 510(b).

## CONCLUSION

For the above reasons,

IT IS ORDERED Rancher's First Omnibus Objection to Stock Holder Proofs of Claim Nos. 38 through 49 is GRANTED to the extent it seeks subordination with respect to Proofs of Claim Nos. 38, 39, 40, 41, 42, 43, 44, 45, 47, 48, and 49, and those claims are hereby found to be subject to subordination pursuant to 11 U.S.C. § 510(b).

Dated June 30, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge

---

[19]  *See* Claimants' Exhibits S, P, X through AA, and CC through HH.

[20]  *American Broadcasting Systems, Inc. v. Nugent, et al. (In re Betacom of Phoenix, Inc)*, 240 F.3d 823, 830 (9th Cir. 2001) (citing *In re Granite Partners*, 208 B.R. 332, 336 (Bankr. S.D. N.Y. 1997)).

[21]  *See* Claimants Exhibit BB.